IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Mary E. Ferguson,

        Plaintiff,

        vs.                                Case No. 11-2563-JTM

Eric K. Shinseki, in his official capacity as
Secretary of Veteran Affairs, United
States Department of Veteran Affairs,

        Defendant.

MEMORANDUM AND ORDER

        This is an action by Mary Ferguson alleging that the defendant Erik Shinseki, acting as the head of the Veteran's Administration, discriminated and retaliated against her when her application for a VA maintenance mechanic position was not approved. The court finds that the application was denied because Ferguson failed to meet the minimum requirements for the position, and not because of gender discrimination or illegal retaliation.

        Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party

need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*Findings of Fact*

In 1975, Ferguson was hired as a temporary Tractor Operator. In 1976, she began working part-time in Food Service. Ferguson was later promoted to part-time, and in 1985 to full-time Food Service Supervisor. In 2001, she was demoted to a Tractor Operator and remained in that position until her retirement in December 2011.

The Defendant posted a Vacancy Announcement for Maintenance Mechanic Leader (MML) position at the Leavenworth Campus on August 6, 2008. The Announcement explained that the applicant's knowledge, skills, and abilities, would be compared to the following job elements:

1. Ability to lead general maintenance mechanics and the other trades as required (SCREEN-OUT ELEMENT).

2. Knowledge of and ability to use and maintain tools, equipment, materials, and measuring devices of the trade (describe your ability to select, use and maintain various tools and equipment).

3. Ability to interpret instructions, specifications, blueprints, shop drawings, etc., in the planning and laying-out of work.

4. Knowledge of technical practices including construction and structure (define your knowledge of the theoretical, precise and/or artistic work using trade theory and up-to-date trade practices used in performing the work).

5. Knowledge of equipment assembly, installation and repair (describe your ability to assemble, install and make minor repairs on all equipment used in the trade).

6. Knowledge of common materials of the trades.

As used by the VA's HR Department, the term "KSAO" refers to Knowledge, Skills, Abilities, and Objectives, which are job elements for the wage grade system positions.

The screen-out element is the first job element that SMEs look at to qualify candidates. That is the ability to do the work, whatever the position title is. An applicant's response to the screen-out element for the MM Leader position is a key response on making it through the application process. It is uncontrovereted that an applicant must meet the screen-out element before he or she can qualify for a position.

Once vacant positions are announced, HR receives all applications and sanitizes them, taking out the applicant's name and identifiers. Sanitized applications are then sent for review by Management-appointed Subject Matter Experts (SMEs) who are familiar with the requirements of the position being filled. The SMEs look at the applications and rate them according to the applicants' responses on their applications and supporting documentation. Based upon that, the SME determines the qualified candidates — the best candidates to be referred.

The HR Representative sits in with the SME as they review applications. The Representative's role is to ensure that everything is in order, and that each SME comes to

a mutual agreement regarding each applicant's qualifications. The Representative provides instructions to the SMEs and serves as a technical adviser who is responsible for making sure that the rules are being followed properly. Under standard VA procedure, after the SMEs rate each applicant, a qualified applicant list is sent to the Selecting Official.

Shawn Scanlon and John Metz were the SMEs for the MML position at the Leavenworth Campus, and reviewed all applications. Scanlon testified that someone asked him to be part of a team that reviewed the applications for the MM Leader under Matt Smith. They then asked him to show up in a conference room on September 19, 2008 to review and rate applications. Metz's supervisor asked him to be an SME because the vacancy sought an MML, and both he and Scanlon held this position. He agreed to do it and his supervisor told him when and where to meet. Scanlon and Metz initially reviewed the MML applications on September 19, 2008.

Metz has worked at VAMC for more than 40 years in various maintenance-related capacities. In 2005, he became the MM Leader. He was the leader for the group that worked on carpentry, masonry, painting, locksmithing, and some electrical.

Metz thought Ferguson was pleasant and he believed she was a hard worker.

Scanlon has worked at the VAMC for 35 years in maintenance-related capacities. During that time, he worked in the HVAC and refrigeration units. At some point in the mid-90s, the agency changed his position description to make him a Maintenance Mechanic Leader (MML). Scanlon continues to work as an MML. He has known Ferguson for 30 plus years. He describes her as a work friend, who is a strong person, who is likeable and jovial. Scanlon has probably known John Metz for 35 years. He would describe John as his workplace associate.

Thirteen applicants applied for the MM Leader position on the Leavenworth Campus. The Human Resource department sanitized the application submissions before giving them to the Human Resource liaison.

Ferguson applied for the position with the Grounds and Maintenance division on August 25, submitting a statement that contained her qualifications.

On September 19, 2008, HR Representative Dixie Jones met with Scanlon and Metz to review the applications for the Leavenworth MML position. Jones first told Scanlon and Metz what they had in front of them, what it was for, to go over each area of consideration, and then give the applicant a score.

When he reviewed the applicants' responses to the KSAOs, and Jones filled out the rating sheet, Scanlon did not apply any other requirements for the job other than what was contained in the KSAO. Similarly, when Metz reviewed each applicant's response, the only thing he had to go by was their KSAO and their rating. After the SMEs completed their comments, Jones wrote on Ferguson's rating sheet: "Applicant does not have experience for a maintenance mechanic to qualify as a maintenance mechanic leader."

Ferguson was Applicant No. 5 and her application submission was attached to her application material. She spent between three and four hours completing her application submission, and she intended to thoroughly and completely describe her qualifications for the job elements in the vacancy announcement.

As noted earlier, Job element No. 1, required a description of the applicant's ability to lead general maintenance mechanics and other trades as required. In her application, Ferguson created headings for each job element. Her heading for the screen-out element was entitled "ability to lead general maintenance mechanics and other trades required." She took that heading from the Vacancy Announcement 2008 863EB, and included information in that section to describe her ability to lead general maintenance mechanics, followed by five paragraphs of comments.

Ferguson acknowledged in her deposition that the first paragraph "doesn't really state that much about the ability to lead general maintenance mechanics." The second paragraph does not contain information about the ability to lead general maintenance

5

mechanics. The third paragraph, she testified, does "not necessarily" describe her ability to lead general maintenance mechanics, "but her ability to lead was demonstrated in the promotion she received" in 1985 as a full-time Food Service Supervisor. The last two paragraphs of that section did not describe her qualification for leading general maintenance mechanics, but her ability to train new employees in the maintenance and grounds department.

Scanlon agreed to rate Ferguson as "1" because of the information she placed on her application. He believed that what Ferguson wrote on her application was not enough for Lead Journeyman positions. The Rating Sheet describes 1 point as "Weak But Of Some Value."

Metz explained that Ferguson's past experience was not in the maintenance field. The MML position requires extensive knowledge on the repair and maintenance of all types of equipment. It includes plumbing, basic electrical, mechanical, and steam repairs, just to name a few. Metz explained that the candidate would not qualify for a basic maintenance mechanic position, much less a leader position.

Metz evaluated applicants based upon how much experience each applicant had. If they worked for a contractor, if they worked in a hospital setting in a maintenance position, if they worked on the outside, or had their own business in building trades. He stated that they were looking for somebody that actually had experience in maintenance that could do all this stuff. Metz also looked to see if the applicant had experience in all trades. Scanlon judged the applications fairly based upon the information provided by the applicants.

The process is intended to be as blind as possible, but the system cannot guarantee perfect anonymity due to the narrative personal work histories completed by the applicants. While reviewing the applications for the Leavenworth MML position, Scanlon told HR that he knew the applicants who worked at the local VA Medical Center — Joe

Thoos, Mike Metcalf, Dave Dropkin, Mary Ferguson, and Clifford Robinson. Scanlon considered all of them his friends, although he did not associate with any of them outside of work. Scanlon recognized Ferguson's application because of its detailed narrative, and because her KSAO described where she worked and what she did.   Similarly, although the names were blacked out, Metz said out loud that he knew some of the applicants. He recognized Joe Thoos, Clifford Robinson, Mike Metcalf, and Mary Ferguson's applications because of the information they put in them. He also thought Harold Ryan put in for the position. Although Metz recognized some of the applicants, he rated them honestly. Scanlon and Metz reviewed everyone exactly the same. They went through each application, they talked about them, and they rated them back and forth together.

      No VA policy requires the application review and rating process to be a completely blind process.  Scanlon informed the HR Representative that although he knew some internal applicants, he believed he could review the applications with a fair and unbiased opinion.

      While Ferguson worked in maintenance and grounds, she served as an SME and reviewed applications for a boiler plant operator position. As an SME, she recognized applicants based upon the information within the application submission.

      Even though Ferguson recognized some applicants, she testified that she could fairly rate applicants she recognized, by basing her decision upon the information within the application material. During her SME experience, the screen-out element required each applicant to provide a driver's license, and the applicant Ferguson recognized only provided an identification card. As an SME, Ferguson determined that the applicant she recognized, who did not have a driver's license, did not meet the screen-out element and "she could not go past the first qualification of the screen out." From this experience, she knows that SMEs must determine if the screen-out element is satisfied before they can qualify an applicant.

Ferguson is unaware of any VA policy that requires SME panel members to disqualify themselves if they recognize an applicant's application.

Ferguson's supervisor, Matt Smith, served as an SME and recognized applicants based upon the information within the application submission. He testified that he believes he was fair when he rated applicants he recognized, partially because an HR person is in the room and they remind you not to dwell on who the person is, but to go with what the applicant wrote down.

When Scanlon and Metz reviewed applications for the MML position, only Scanlon, Metz, and the HR Representative were present in a conference room. While there, Scanlon and Metz made all rating decisions for each applicant. Neither Scanlon nor Metz sent or received emails regarding their rating decisions and their only involvement in the application process was reviewing applications and rating each applicant. Neither Scanlon nor Metz were Ferguson's supervisors.

Initially, Ferguson, along with male applicants, B. Gabrick, J. Maasen, and D. Dropkin, were all deemed not qualified for the MM Leader on the Leavenworth Campus.

On September 26, 2008, Ferguson learned that the SMEs did not qualify her for the MML position. When Ferguson learned that she did not qualify, she approached Scanlon. She was not happy because she believed she should have qualified.

HR asked Metz and Scanlon to re-evaluate applications for the MM Leader position again on October 1, 2008, because some applicants complained. Although she had approached Scanlon, Ferguson had not independently complained to HR. Scanlon and Metz then conducted a second review of each applicant who failed to qualify in the first review, including Ferguson.

When Metz reviewed the applications, the only thing he had to go by was their KSAO and their rating. He evaluated applicants based upon how much experience each applicant had. If they worked for a contractor, if they worked in a hospital setting in a

maintenance position, if they worked on the outside, or had their own business in building trades. Metz stated that they were looking for somebody that actually had experience in maintenance that could do all this stuff. Metz also looked to see if the applicant had experience in all trades.

Scanlon informed HR that he knew some of the applicants, but HR asked him to review them. When HR asked Scanlon if he could review them with a fair and unbiased opinion, Scanlon said that he could. He also testified that when he reviewed the applicants' responses to the KSAO and filled out the rating sheets, he did not apply any other requirements other than what was contained in the KSAO.

On October 1, 2008, HR Representative Conley Staring met with Metz and Scanlon to review the applications. Starling wrote down the SMEs' comments on the Rating Sheet in the Source of Information areas and on the back of the sheet if more space was needed to document their comments. The comments are from the SMEs, not from the HR Representative, as supported by the Crediting Plan, Position Description, and the applicants' written comments on their applications.

During their second rating, the SMEs gave Ferguson the benefit of the doubt on the screen-out element because she did mention some leadership experience and because she worked in the kitchen, which was a general trade, and increased her rating to "2," which is defined as "Acceptable." On Applicant No. 5's Rating Sheet, based upon SME comments, Starling wrote the following words next to Job Elements 5 and 6: "Never a building maintenance, Never journeyman level, Never, Volt Meters, pipethreader, Never pressure gages [sic] as indicated in the Crediting Plan." Starling included additional comments from the SME's on the reverse side of the Rating Sheet that included the following: "…doesn't use all of the tools of a maintenance mechanic such as Volt Meter (OHM), Pressure Gage, measuring devices, levels, and transits; doesn't use the specialized tools…"

After the October 1, 2008 application review, Ferguson, B. Gabrick, and J. Maasen were rated as not qualified for the Leavenworth MML position.

It is uncontroverted that Metz and Scanlon's only involvement in the application process was to review and rate applications on September 19, 2008 and October 1, 2008.

Andrew Baden was the Selecting Official for the position.

Ferguson has no evidence which would attribute the lack of female supervisors in the maintenance department to either Scanlon or Metz.

Ferguson had filed EEO complaints on March 31, 2001, July 17, 2002, and July 2005. She had also filed a federal lawsuit in 2004, claiming that the Defendant retaliated and discriminated against her based upon her sex, among other issues.

Neither Scanlon nor Metz were alleged discriminating officials in Ferguson's March 31, 2001 EEO complaint. Metz did not participate in the investigation of that complaint, or have any conversations with Ferguson about it. Scanlon was not a witness nor did he participate in the investigation.

Neither Scanlon nor Metz were the alleged discriminating officials in Ferguson's 2002 and 2005 EEO complaints. Metz and Scanlon were not witnesses, and did not participate, in the investigation of either complaint, or the 2004 lawsuit.

Prior to the first review, Ferguson's most recent prior EEO activity was her initial contact with the Agency's Office of Resolution Management on July 27, 2005. The Defendant contends that Scanlon and Metz were unaware that Ferguson had been involved in prior EEO activity when they reviewed her application. Scanlon knew that a number of years ago, Ferguson "fought for her Supervisor's job," but "did not know any details."

The plaintiff argues that this untrue, citing evidence that Metz knew she had gotten into some disagreements with the VA. But the cited evidence fails to show that Scanlon or Metz knew of any EEO activity, with a single exception. In responding to the motion for summary judgment, Ferguson asserts in her affidavit: "In my conversations with Shawn

Scanlon, prior to the time I was rated for the MML position, he communicated to me that he was aware of some of my prior EEOC activity."

In her deposition, Ferguson stated that, at some time between 2001 and 2008, Ferguson had a conversation with Metz, in which he stated

> his perception ... of women when he was talking about his daughter-in-law of their place in the home. Their responsibility to take care of children. The shopping. To not going out in the evenings. Was his perception that he gave me of his personal life.

She also testified that a co-worker, Edward Reed, made the comment "tits and tires do not go together," shortly after she was assigned as a tractor operator in July 2001. She was not present when Reed allegedly made this comment. Neither Scanlon nor Metz ever made a "tits and tires don't go together" comment in her presence, and she cannot attribute such a comment to either Scanlon or Metz, nor has she presented any admissible evidence establishing that the comment was generally used in the Engineering Department.

On December 15, 2008, the SMEs in Topeka found that Ferguson was qualified for the MML position in Topeka, Kansas. Scanlon and Metz were not the SMEs for this review. Moreover, the Topeka and Leavenworth MML jobs involved different position descriptions, different crediting plans, and different trades.

*Conclusions of Law*

*Sex Discrimination*

The defendant VA contends that the plaintiff has failed to demonstrate a prima facie case of sex discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-4 (1973) because two essential elements are missing — that Ferguson was qualified for the MML position, or that she was treated less favorably than males applying for the position. Even if Ferguson had presented a prima facie case of discrimination, it contends, it had a legitimate reason for selecting another person for the position. *Turner v. Public Service Co. Of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009).

11

In the present case, it is uncontroverted that prior maintenance mechanic experience was a screen-out element for the position, and that Ferguson did not include information on her application demonstrating that she had the experience to satisfy the screen-out element. Each applicant was required to explain their ability to lead general maintenance mechanics and other trades, yet Ferguson's application is silent as to her qualifications or her ability to lead general maintenance mechanics. From her own prior experience as an SME, she knew that SMEs must determine if the screen-out element is satisfied before they can qualify an applicant. Here, both Scanlon and Metz reviewed Ferguson's application on September 19, 2008, and concluded that Ferguson did not include enough information within her application to satisfy the screen-out element.

The Leavenworth MML position explicitly required experience in leading maintenance mechanics. Because Ferguson has failed to show that she met the objective qualifications for the MML position, summary judgment is appropriate.

Ferguson suggests that sex discrimination is shown by the fact that in the October re-rating of the applicants, she received a different score, a marginal "2" rather than a "1." But the evidence fails to show any discriminatory intent. Scanlon and Metz were assigned to review the non-qualifying applicants, and did so, both for Ferguson and other, male applicants on an explicitly more generous basis. Ferguson's score for the screen-out element itself increased; the scores of some male applicants also increased. However, even while Ferguson's score on the first, screen-out element was now a minimal "2," her total score on all of the six elements was only a "10." The MML position required a minimum total score of "12."

Ferguson also suggests that an inference of discrimination also exists because Scanlon and Metz recognized her application. The facts, however, show that while the VA application tries to be as "blind" as possible, complete anonymity is impossible because of the work history narratives submitted by the applicants. When she acted as an SME for

12

other VA positions, Ferguson herself had recognized some applications, but proceeded to rate the applications based on her belief that she could do so fairly.

Here, Scanlon and Metz recognized Ferguson's application, but they also recognized applications submitted by men. Scanlon and Metz notified the HR Representative that they recognized some of the applications, but stated they believed they could judge the applications fairly. There is no evidence that either Scanlon or Metz treated Ferguson's application any differently or unfairly.

Similarly, there is no evidence that other, male applicants without maintenance mechanic leadership received higher scores that Ferguson. Scanlon and Metz reviewed all the applications for the MML position, and gave each applicant scores on the six relevant elements. All of the applicants, male or female, who lacked maintenance mechanic experience were deemed not qualified.

Even assuming a prima facie case of discrimination were presented, the VA had legitimate reasons for rejecting Ferguson's application. As recorded by the HR Representative in attendance during the selection, and as noted earlier, the SMEs observed that Ferguson was "never a building maintenance, Never journeyman level, Never Volt Meters, pipethreader, Never pressure gages [sic] as indicated in the Crediting Plan." They further observed that Ferguson's application failed to show "use all of the tools of a maintenance mechanic such as Volt Meter (OHM), Pressure Gage, measuring devices, levels, and transits; doesn't use the specialized tools." These observations are all true, and Ferguson has failed to show that Scanlon or Metz utilized such considerations as a mask for discrimination.

In her response, Ferguson stresses a single remark made by Metz at some time as indicative of gender bias. That comment, made perhaps seven years before her application for the Leavenworth MML position, focused on Metz's belief that his daughter-in-law should stay home and take care of her children, rather than going out shopping and staying

out late at night. There is no evidence showing that either Scanlon or Metz made any other remarks reflecting gender bias.

A single statement of generalized bias is insufficient by itself to show a causal connection between the alleged bias and an adverse job action. *See Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1144 (10th Cir. 2009). According to the objective, published criteria for the Leavenworth MML position, Ferguson was less qualified for the position than other candidates. Scanlon and Metz rejected Ferguson's application because it demonstrated that she failed to meet the requirements for the position, and Ferguson has failed to show that this judgement is sufficiently weak, implausible, inconsistent, or contradictory that a rational fact-finder could find it unworthy of belief. See Turner, 563 F.3d at 1142.

*Retaliation*

As noted earlier, Ferguson also complains that the VA subjected her to retaliation when subject matter experts did not qualify her for the MML position at the Leavenworth Campus. The VA has moved separately for summary judgment on the claim retaliation, because the facts fail to show that the decision makers involved knew of her protected EEO activity, and because she had not demonstrated any causal connection between the protected activity and her failure to receive the MML promotion.

Ordinarily, the party claiming that an adverse employment decision reflects illegal retaliation must present some evidence showing that the decision-maker was aware the party had engaged in protected conduct. *See Hinds v. Sprint/United Management Company*, 523 F.3d 1187, 1203 (10th Cir. 2008). In the present case, there is strong and consistent evidence showing that the SMEs Scanlon and Metz, who found she was unqualified for the MML position, were unaware of her prior EEO claims.

In her Response to the motion for summary judgment, Ferguson points to evidence showing the VA facility was like a "small town," and that Scanlon and Metz had known she had to previously "fight for her job." None of this evidence, however, controverts the direct evidence from Scanlon and Metz that they had no knowledge of EEO claims by Ferguson. Further, this evidence fails to counterbalance Ferguson's own admission that she was unaware of what Scanlon and Metz actually knew about her EEO claims.

With respect to that admission, Ferguson claims that the quotation presented by the VA is taken out of context. But the full context of the statement is not helpful to the plaintiff. After filing the EEO complaint which led to the present litigation, Ferguson was asked by the investigator "how and when these individuals [Scanlon and Metz] became aware of your prior EEO activity?" She responded:

> Oh, they was aware of it when it was going on. *I mean, there was a lot of talk. I'm – I don't know.* I'm one of the most visible employees out here on this station, because I'm everywhere. I'm talked about a lot. I never get to hear all of it. I only hear bits and pieces of it.
>
> But they was aware when I called JHACO and they was aware of me fighting with Mr. Hogle over some doors that we had up here that wouldn't stay open. And I had to fight with them, because they was in Engineering and this was going on in Engineering.

(Emphasis added). That is, Ferguson directly acknowledged that she had no personal knowledge that Scanlon and Metz were aware of the EEO activity.

The only evidence cited by Ferguson in her response that suggests a different result is one passage in her affidavit stating: "ln my conversations with Shawn Scanlon, prior to the time I was rated for the MML position, he communicated to me that he was aware of some of my prior EEOC activity."

This statement is directly inconsistent with Ferguson's statement to the EEO investigator that Scanlon and Metz had to know of her EEO activity because "there was a lot of talk" and "I'm talked about a lot." In addition, the VA challenges the value of this statement as purely conclusory and self-serving, with no explanation of when this alleged

15

conversation occurred or the specific statements supposedly uttered by Scanlon. *See Fischer v. Forestwood Co.*, 525 F.3d 972, 978 (10th Cir. 2008) (quoting *Piercy v. Maketa*, 480 F.3d 1192, 1197 (10th Cir. 2007)) (affidavit in response to summary judgment motion "may be insufficient to create a triable fact if it is nonspecific or otherwise nonresponsive, vague, conclusory, or self-serving").

The court finds that it need not resolve the issue of whether the SMEs were aware of the protected activity, because it finds that summary judgment is warranted in light of Ferguson's failure to otherwise demonstrate the existence of a causal connection between her EEO activity and the denial of the MML promotion. That is, even assuming Scanlon and Metz knew of the EEO activity, Ferguson has failed to show a substantial causal connection between the two. Causation is one of the essential elements of a prima facie case of retaliation. *See McMillin v. Foodbrands Supply Chain Services*, 272 F. Supp. 2d 1211, 1218 (D. Kan. 2003).

A plaintiff claiming retaliation must supply evidence of circumstances which "justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *O'Neal v. Ferguson Construction*, 237 F.3d 1248, 1253 (10th Cir. 2001) (citing *Burrus v. United Tel. Co. of Kan.*, 683 F.2d 339, 343 (10th Cir. 1982)). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *Id.*

Here, Ferguson had last engaged in protected EEO activity some three years before her application for the MML position, a length of time which provides no suggestion of a retaliatory motive. *See Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999) (three-month gap standing alone was insufficient to demonstrate causation); *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1234 (10th Cir. 2000) (six-month gap).

The remaining circumstances of the case fail to present any substantial basis for inferring a retaliatory motive. It is uncontroverted that neither Scanlon nor Metz had any

motive for retaliating against Ferguson. Both SMEs were friendly with Ferguson and had no animus against her. Further, both SMEs had legitimate grounds for rating Ferguson as unqualified for the Maintenance Mechanic Leader position. Ferguson's work experience in her application was overwhelmingly centered in Food Service, and Scanlon believed that Ferguson's work history would not qualify Ferguson for a Lead Journeyman position. Similarly, Metz understood that the MML position required extensive knowledge of electrical, mechanical, and plumbing repair and maintenance, and that Ferguson simply did not qualify. In light of all the circumstances of the case, the court finds that summary judgment should issue against Ferguson's retaliation claim.

IT IS ACCORDINGLY ORDERED this 20th day of December, 2012, that the defendant's Motions for Summary Judgment (Dkt. 51, 68) are hereby granted.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE